IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

LESLIE J. HUGGINS                                              PLAINTIFF

v.                                          CIVIL ACTION NO. 1:22-CV-112-SA-DAS

KEYTRONIC CORPORATION;
AYRSHIRE ELECTRONICS OF MISSISSIPPI, LLC                       DEFENDANTS

ORDER AND MEMORANDUM OPINION

On August 15, 2022, Leslie J. Huggins initiated this civil action against Keytronic Corporation and Ayrshire Electronics of Mississippi, LLC (collectively "Keytronic").[1] Her Amended Complaint [40] brings a retaliation claim under Title VII and 42 U.S.C. § 1981. Now before the Court is Keytronic's Motion for Summary Judgment [56]. The Motion [56] has been fully briefed and is ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

Keytronic manufactures circuit boards and other electronics. The company is headquartered in Spokane, Washington and maintains a location in Corinth, Mississippi.

Huggins worked at Keytronic in Corinth from January 2019 until September 27, 2021. Huggins began her employment as a front office assistant. After six months, she moved to a human resources ("HR") associate position.[2] As an HR associate, Huggins reported to Will Plaxico, HR manager in Corinth, and Lindsey Litsheim, corporate HR manager in Spokane.

---

[1] The parties agree that Keytronic Corporation purchased Ayrshire Electronics of Mississippi, LLC in September 2014. While the companies maintain separate legal names, the parties treat them as one and the same because they share the Keytronic logo and operations. Therefore, the Court will similarly refer to the Defendant-companies collectively as "Keytronic."

[2] At her deposition, Huggins did not describe her movements within the company as promotions, but the Court notes that she received a pay increase each time she changed positions.

The make-up of the HR department eventually changed. Plaxico stepped down from the HR manager position and was out on medical leave from June 2021 until November 2021. Debra Perry took his place as HR manager in Corinth. Litsheim remained the corporate HR manager in Spokane.

While working in HR, Huggins applied for an open program manager assistant/administrator ("program administrator") position in the program management department. She was hired to fill that position in October 2020. She then reported to Devin Caress, the supervisor of program management.

At Keytronic, program managers act as liaisons between the company and its customers. In short, they manage customer accounts, supply quotes, and handle sale and purchase orders. Program administrators, such as Huggins, support the program managers. They handle certain technical documents and customer information, including documentation that accompanies product shipments, sometimes referred to as shipping tickets.

In June 2021, problems began to arise with shipping tickets for a customer named Elster. Huggins alleges that she noticed a lack of communication regarding the shipping tickets for Elster and brought the issue to Caress' attention. Caress alleges that Ricky Perry ("Ricky"), the program manager to whom Elster was assigned, came to him with frustration that Huggins was not properly completing the shipping tickets. In any event, on June 18, 2021, Caress sent an email scheduling a meeting to discuss the Elster shipping tickets. The email states that the meeting "will be a review of the Elster Shipping/Communication/Required Documentation Process" and includes the following objective: "Determine who/how/when for fulfillment." [56], Ex. 1 at p. 40.

The meeting took place on June 22, 2021. In attendance were Huggins; Caress; Ricky; Keisha McCormick, associate program manager; and Misty Johnson, materials planner. Caress

contends that at the meeting, he told Huggins that the Elster shipping tickets were her responsibility. He alleges that Huggins pushed back against this instruction and asserted that this had never been the program administrator's responsibility. According to Caress, Huggins asserted that Cindy Dickey, her predecessor, was not required to handle the Elster shipping tickets. On the contrary, Huggins contends that she knew the shipping tickets were her responsibility. She contends that Dickey told her that it had been the program manager's responsibility in the past but that program administrators assisted with it when the program manager was overwhelmed. For that reason, Huggins contends that she (and prior to her, Dickey) completed the Elster shipping tickets for Ricky because Elster was his customer and he was overwhelmed.

On June 24, 2021—two days after the meeting—Huggins sent an email to McCormick explaining how to complete the Elster shipping tickets, as Huggins was going to be out the next day. With Caress and Ricky copied on the email, McCormick responded: "[I]t is my understanding that I will only do this when you are not here." [56], Ex. 5 at p. 2. With Caress and Ricky still copied, Huggins replied: "I will be out of the office tomorrow, but this is part of the Program Managers [sic] duties or at least it always has been in the past. I just took this on to help Ricky out some before you were hired on." *Id.*

Later that day, as a result of the email exchange, Caress called Huggins into his office. At his deposition, Caress testified that, during this conversation in his office, he told Huggins that the shipping tickets were her responsibility. He contends that he asked her if she understood that it was her responsibility, and she "became incredibility agitated." [56], Ex. 3 at p. 10. He testified that Huggins insisted, as she had at the meeting two days prior, that the tickets were the program manager's responsibility and that Dickey never handled shipping tickets. Caress testified that he was also agitated and that he asked Huggins to accompany him to Debra Perry's office in HR.

Caress alleges that after he and Huggins moved their meeting to Perry's office, Huggins continued to deny that the shipping tickets were her responsibility. According to Caress, Huggins continuously stated "I do my job" and denied that the shipping tickets were her job. Caress therefore stepped out of the office and returned with Mike Simone, the general manager of the Keytronic facility in Corinth. Caress asked Simone to clarify that the Elster shipping tickets were Huggins' responsibility, which Caress contends he did.

After the meeting concluded, Caress and Perry prepared an "Employee Warning Notice" (hereinafter "the reprimand"). *See* [56], Ex. 6 at p. 2. The reprimand, dated June 24, 2021, states that it is a "Final Written Warning" due to "Insubordination—Failure to complete tasks assigned to her." *Id*. Under "Description of Infraction," it states: "Leslie did not do the tasks she was assigned even after a meeting on Tuesday in which she was specifically instructed to do so. When her manager confronted her with it, she became combative." *Id*.

At his deposition, Caress testified that after he prepared the reprimand, he asked Huggins to meet him in Perry's office again.[3] Caress contends that he read the reprimand out loud to Huggins who refused to read and sign it. On the last page of the reprimand, Perry wrote: "Stormed out of the office without signing." *Id*. at p. 3. Perry and Caress signed next to the handwritten statement.

---

[3] The Court notes that the dates of the meetings between Caress and Huggins become muddled at this point. The evidence consistently reflects that Caress and Huggins (eventually joined by Simone) initially met in Perry's office on June 24, 2021. At his deposition, Caress testified that after their initial meeting ended, he remained in Perry's office to prepare the reprimand. He further testified that he presented the reprimand to Huggins in Perry's office later the same day (June 24, 2021) and that he met with Huggins again on June 28, 2021. For her part, Perry testified that she prepared the reprimand with Caress after the initial meeting but actually presented the reprimand to Huggins on June 28, 2021. Lastly, Huggins testified about the initial June 24, 2021 meeting but asserted that she had no issues with Caress after that. However, she testified that she spoke with Perry on June 28, 2021.

At her deposition, Huggins described the events of June 24, 2021 differently. She testified that when Caress called her into his office after the email exchange with McCormick, he was "enraged" and told her not to tell his program managers what to do. [56], Ex. 1 at p. 10. She asserts that she never raised her voice at Caress. Instead, she "sat there in tears" and "in shock" because they had never had an issue before. *Id*. Huggins further testified that after she and Caress moved to Perry's office, Caress continuously told Perry to "[w]rite her up for insubordination," to which she asked, "For what?" *Id*. Huggins alleges that after Simone came in and began saying the same things as Caress, she could "barely speak" and continuously stated "I do my job." *Id*. at p. 11. According to Huggins, this went on for a few minutes before Simone asked, "Do you understand what your job is?" *Id*. Huggins contends that she responded affirmatively and the meeting ended.

As to the June 24, 2021 reprimand, Huggins alleges that she did not see it until after she was terminated and filed an EEOC Charge. At her deposition, she testified that she and Caress had no issues and barely spoke after June 24, 2021. However, she noted that Perry came into her office on June 28, 2021 and asked for her side of the story.

On the other hand, at his deposition, Caress testified that there was an additional meeting on June 28, 2021. Caress alleges that after Huggins refused to sign the reprimand on June 24, 2021, Perry advised him to wait a few days before trying to talk to Huggins again. Thus, on June 28, 2021, he called Huggins into his office. He alleges that he asked if she understood her responsibilities and referenced the communication with Simone and the reprimand she refused to sign. In response, according to Caress, Huggins "absolutely blew up again" and abruptly left his office. [56], Ex. 3 at p. 12.

Caress testified that he made it a point to not speak to Huggins about the shipping ticket issue after the June 28, 2021 meeting. He further testified that the issue continued to come up, so

he asked Ricky to document every time Huggins missed a shipping document. He alleges that Keytronic received a "corrective action preventative action form" from Elster due to the shipping ticket issues. *Id.*

According to Caress, in September 2021, he received a phone call from a program manager saying that Huggins had missed another shipping ticket. He then informed Simone and Perry that he had had enough and intended to terminate Huggins. Perry contacted Litsheim and notified her that Caress intended to terminate Huggins. Litsheim then instructed Perry to collect documentation to support the termination.[4]

On September 21, 2021, Caress sent an email to Perry outlining the reasons he intended to terminate Huggins. The email describes the June 2021 meetings and states that Huggins should be terminated because "she refuses to comply with the requirements of her position." [56], Ex. 3 at p. 44.

On September 27, 2021, Caress called Huggins into his office and informed her she was terminated. Huggins contends that she was taken aback because Caress told her she had not been doing her job, but she was not aware of any issues after June 24, 2021. Perry was present when Huggins was terminated.

Huggins thereafter filed an EEOC Charge and initiated this action, alleging that she was terminated for opposing race discrimination.[5] At her deposition, Huggins testified that in June

---

[4] At her deposition, Perry testified that she collected documentation including emails from Ricky, emails between Ricky and Caress, the reprimand, and statements from two employees who allegedly heard Huggins accost Caress in his office on June 28, 2021. The Court notes that the reprimand is the only one of those documents included with the summary judgment evidence. However, the record includes a September 21, 2021 email from Randy Plunk, who supervised Huggins at some point, stating that Huggins "has not progressed as [he] would have expected" due to lack of initiative. [56], Ex. 11 at p. 2.
[5] In her EEOC Charge, Huggins alleges that her termination was retaliatory because she was listed as a witness in the EEOC Charge of Jessica Carter, a Black employee. She also alleges that she reported race discrimination in an allegedly anonymous survey shortly before she was discharged. *See* [56], Ex. 14. In its Motion [56], Keytronic alleges that Carter's EEOC Charge lists no witnesses and that Keytronic did not

2021 she both emailed and called Litsheim to report that Perry was treating Black employees less favorably than White employees.[6] Huggins alleges that she emailed Litsheim on June 28, 2021 and complained that Perry did not attempt to mediate or diffuse the heated meeting with Caress. Huggins alleges that she also spoke with Litsheim on the phone at some point *before* she emailed her. During the phone call, she complained to Litsheim that Perry treated Black employees differently during personal interactions, when handling reprimands, and when handling unemployment matters.

At his deposition, Plaxico, the former HR manager, testified that Litsheim called him while he was on medical leave and told him that Huggins had complained that Perry was racist.[7] According to Plaxico, Litsheim was investigating the complaint and asked him if he felt that Perry was racist. In a separately submitted declaration, Plaxico added that he did not discuss Huggins' complaint with anyone but Litsheim.

Conversely, Litsheim contends that Huggins never reported race discrimination at Keytronic. At their depositions, both Litsheim and Perry testified that Huggins had complained about a floral arrangement. Specifically, according to Perry, after a former employee passed away in 2021, Keytronic sent an artificial floral arrangement with a cross or a church in it because the vendor was out of other options. Perry asserted that Huggins complained that the religious nature of the arrangement was inappropriate.

---

receive the Charge until after Huggins' termination. Keytronic further argues that the survey was in fact anonymous. In her Response Memorandum [64], Huggins does not respond to Keytronic's arguments or otherwise reference the survey or Carter's Charge. Thus, in its Reply [67], Keytronic asserts that Huggins has abandoned any retaliation claim based on Carter's Charge or the survey. The Court agrees. *See McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1010 (5th Cir. 2023) ("a party abandons a claim by failing to defend it in response to motions to dismiss and other dispositive pleadings").

[6] The Court notes that Huggins is White. She was reporting alleged discrimination against other employees.
[7] For context, the Court notes again that Plaxico was on medical leave from the end of June 2021 until November 2021.

At her deposition, Litsheim testified that she never told Plaxico that Huggins had complained about race discrimination. Litsheim alleges that she called Plaxico while investigating a different, anonymous complaint about race discrimination and Plaxico in turn told her about Huggins' complaint regarding the floral arrangement.

In the present Motion [56], Keytronic contends that even if Huggins did call or email Litsheim to complain of race discrimination, she was not terminated for that reason because (1) she complained *after* she already had performance issues and had been reprimanded and (2) Caress was unaware of her complaint.

In response, Huggins contends that Perry and Caress prepared the reprimand on the same day that she complained to Litsheim. Huggins further contends that her work environment changed after she complained, indicating that her termination was pretextual.

### Summary Judgment Standard

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts

showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Though Huggins brings her retaliation claim under both Section 1981 and Title VII, "[t]he legal framework governing these claims is coextensive." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citing *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007)). Where, as here, a plaintiff does not present direct evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (citing *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021)).

Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019). To do so, the plaintiff must show that: "1) she engaged in a protected activity; 2) she suffered an adverse employment action; and 3) there is a causal connection between the two." *Owens*, 33 F.4th at 835 (citing *Saketoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022)). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Harville,* 945 F.3d at 875,

879. If the employer articulates such a reason, the plaintiff must demonstrate that the employer's proffered reason is a pretext for retaliation. *Id*. at 879. "Ultimately, in order to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (citing *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019)) (internal quotation marks omitted).

The parties' dispute centers on whether Huggins creates a question of fact as to the causal connection between her complaint and termination. The Court will address each step of the framework in turn.

### A.    Prima Facie Case

First, the parties do not dispute that Huggins has put forth sufficient evidence to establish the first two elements of her prima facie case. At their depositions, both Huggins and Plaxico testified that Huggins called Litsheim to report Perry's alleged discrimination. The parties further agree that Huggins was terminated and therefore suffered an adverse employment action.

As to the third prima facie element, while Keytronic broadly disputes whether Huggins has sufficiently demonstrated a causal connection between her complaint and termination, it raises no specific argument that Huggins is unable to satisfy her "very minimal" prima facie burden. *Owens*, 33 F.4th at 825. "'[C]lose timing' between the protected activity and adverse action can establish the causal link required to assert a prima facie case." *Id*. at 835 (citing *Swanson v. GSA*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997)). As discussed below, the date of Huggins' call to Litsheim is disputed. Huggins testified that she called Litsheim before June 28, 2021. The record reflects that the call would have occurred while Plaxico was on medical leave, which began at the end of June 2021. She was terminated on September 27, 2021, approximately three months later. This close

timing is sufficient to demonstrate a causal connection at the prima facie stage. *See January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) ("We've repeatedly held periods of a few months sufficient to satisfy causation in a prima facie case.") (citing *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)). Therefore, Huggins has established a prima facie case of retaliation for summary judgment purposes.

  B.  *Legitimate, Non-Retaliatory Reason*

  The burden now shifts to Keytronic to provide a legitimate, non-retaliatory reason for Huggins' termination. "'This burden is one of production, not persuasion,' and it involves no credibility assessment." *Musser*, 944 F.3d at 561 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). At his deposition, Caress testified that "[Huggins] was terminated for insubordination, failure to perform a duty. That specific duty was failure to provide the proper packing slips to product that was being shipped out on behalf of Elster Company." [56], Ex. 3 at p. 14. This is sufficient for summary judgment purposes.

  C.  *Pretext*

  "To survive summary judgment now, [Huggins] must show that [her] protected act was a but for cause of [her] termination." *January*, 74 F.4th at 654 (citing *Owens*, 33 F.4th at 835) (internal quotation marks omitted). To do so, she must produce "substantial evidence" indicating that Keytronic's proffered reason is a pretext for its actual retaliatory reason. *Id*. (citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of

impartial judgment might reach different conclusions." *Owens*, 33 F.4th at 826 (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2003)).

"A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Harville*, 945 F.3d at 879 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)). "Indeed, 'in an appropriate case, a factfinder may infer the ultimate fact of retaliation from the falsity of the employer's explanation." *January*, 74 F.4th at 654 (citing *Brown*, 969 F.3d at 571). "In those situations, 'a plaintiff may withstand a motion for summary judgment without adducing additional, independent evidence of retaliation.'" *Id.* (citing *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) (employer's shifting and inconsistent reasons, which contradicted employee's recent glowing performance reviews, sustained an inference of pretext)). "Even so, though, [the plaintiff's] 'evidence of falsity must be of sufficient nature, extent, and quality to make the inferential leap to [retaliation] a rational one." *Id.* at 655 (citing *Owens*, 33 F.4th at 826 n.7 (though employee provided enough evidence to permit a finding that the employer's proffered justification was false, the evidence did not permit a rational inference that the real reason was discrimination)).

Ultimately, Huggins' protected conduct must be "*the* reason for the adverse action." *Owens*, 33 F. 4th at 835 (emphasis in original). "In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Id.* (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).

Keytronic argues that Huggins cannot demonstrate pretext because Caress, the decisionmaker, had no knowledge of Huggins' complaint about race discrimination. Huggins relies on the following evidence to demonstrate pretext: (1) evidence suggesting that Perry knew of her

complaint and was involved in her termination decision; and (2) the timing of the reprimand and change in her work environment following her complaint. The Court will walk through the parties' arguments and evidence in turn.

     *i.*  *Decisionmaker Knowledge*

  "[T]o establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003)). "Generally, this requires some showing that the decisionmaker—the individual 'who actually made the decision or caused the decision to be made'—was aware of the activity." *Id.* (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).

  "[D]irect proof of decisionmaker knowledge can be elusive, particularly when the decisionmaker. . . disclaims prior knowledge entirely. It is unsurprising then that '[a] decisionmaker's awareness may be established by circumstantial evidence.'" *Robinson v. Jackson State Uni.*, 714 F. App'x 354, 360 (5th Cir. 2017) (quoting *EmCare*, 857 F.3d at 683). "But carrying that burden requires 'more evidence than mere curious timing coupled with speculative theories,' and isolated 'evidence of generalized discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity creates only a speculative inference regarding the decisionmaker's awareness.'" *Id.* (quoting *EmCare*, 857 F.3d at 683). Instead, "temporal proximity, specific conversations with knowledgeable colleagues, changed decisionmaker behavior following complaints, pretext, and parallel outcomes for similarly-situated employees [] are among the prototypical circumstantial indicators of decisionmaker knowledge (and of causation in a broader sense)." *Id.* (citing *EmCare*, 857 F.3d at 684 & n.2.). Ultimately, the

plaintiff's "quantum of circumstantial evidence" must create "a reasonable inference of decisionmaker knowledge." *Id.*

Here, Keytronic asserts that Caress was the decisionmaker. At his deposition, Caress testified that he was "[d]irectly responsible" for Huggins' termination. [56], Ex. 3 at p. 5. Conversely, in her Response Memorandum [64], Huggins seems to assert that Perry was also a decisionmaker: "Debra Perry was responsible for generating some of the documents which led to Huggins' termination and was also one of two (2) people involved in the decision to terminate Huggins." [64] at p. 6-7. In support of her position, Huggins cites the following part of Caress' deposition testimony:

> Q.   So what you're saying is you – what you're testifying to is that you terminated her – you personally terminated her. Nobody but you, right? You did. Nobody else was conferred about it. Nobody else had had a roll in but you, correct?
>
> A.   Oh, I disagree with that statement. I had to get – I had to inform the general manager, Mike Simone, and I have to involve the HR manager, Debra Perry, of why. . . I had had enough, and I told Mike Simone what my intention was, was to terminate her for that reason. I then went to the human resource department because that was part of the process, told them what my intention was, and then Debra Perry was present in my office when I terminated her.

[56], Ex. 3 at p. 18.

Even viewing the evidence in the light most favorable to Huggins, she has not pointed to any evidence suggesting that Perry "actually made the decision or caused the decision to be made." *EmCare*, 857 F.3d at 683. Rather, Caress' deposition testimony demonstrates that he informed Perry of his intention to terminate Huggins and that she was then present when Huggins was terminated. The testimony clearly indicates that Caress made the termination decision but involved others in carrying out the decision. Huggins has not rebutted this in any way. Thus, the Court finds

that Caress was the decisionmaker. The Court will therefore proceed to whether Huggins has created a question of fact as to Caress' knowledge of her complaint.

Huggins contends that she complained about Perry's alleged racism to Litsheim and that "there was really no confidentiality between Lindsey [Litsheim] and Debra [Perry]," so "anything that Litsheim knew would be communicated to Perry." [64] at p. 6. Huggins further contends that "her work environment changed" after she made the report to Litsheim. *Id.* at p. 2. Huggins suggests that Caress was aware of her complaint because he generated the reprimand with Perry and stopped speaking to Huggins shortly thereafter.

Keytronic responds that Huggins' position is purely speculative. At Perry's deposition, she asserted that the only complaint she knew of was Huggins' complaint regarding the floral arrangement, indicating she could not have told Caress about a complaint regarding race discrimination. *See* [56], Ex. 2 at p. 12. At her deposition, Huggins admitted that she did not have any direct evidence that Caress was aware of her complaint. *See* [56], Ex. 1 at p. 12. Thus, Keytronic contends that there is no evidence that Caress had knowledge of Huggins' complaint.

The Court acknowledges that at her deposition, Huggins stated the following:

> Q.    Okay. You never made any oral or written complaints to Mr. Caress about – or reports to him about racism at Keytronic, had you?
>
> A.    No, sir. I just went straight to corporate HR.
>
> Q.    All right. So as far as you know, Mr. Caress was unaware of any oral or written complaints that you had made about racism?
>
> A.    As far as I know, correct.

[56], Ex. 1 at p. 11-12.

However, Huggins' inability to present direct evidence on the issue of Caress' knowledge does not foreclose the possibility of Huggins' creating a question of fact as to this issue. *See, e.g., Robinson*, 714 F. App'x at 360 (quoting *EmCare*, 857 F.3d at 683) ("[D]irect proof of decisionmaker knowledge can be elusive. . . [a] decisionmaker's awareness may be established by circumstantial evidence."). Huggins may still demonstrate that Caress was aware of her complaint through circumstantial evidence. *See id.*

As to circumstantial evidence, the Court begins with Huggins' contention that anything she told Litsheim would be shared with Perry. At her deposition, Huggins testified not only that Litsheim shared information with Perry but also that Perry in turn shared information with other employees:

> Q.    Were you present for any conversations between Lindsey Litsheim and Debra Perry relating to you or your job situation?
>
> A.    No, sir.
>
> Q.    Okay.
>
> A.    There was really no confidentiality between Lindsey and Debra. So that's another reason people felt more comfortable, you know, not going to Debra. Because they knew if they went to Lindsey[,] Debra would find out what was going on. There was no confidentiality.
>
> Q.    You don't know what Lindsey said to Debra, if anything, about the complaints that you made, do you?
>
> A.    No, sir. I don't know what she said to her.
>
> Q.    Okay.
>
> A.    If anything.
>
>        . . .

Q.     Okay. In your EEOC charge you say that Ms. Perry told an employee that was transferring to our department that she should be wary of me, meaning you, because I would call corporate on her. Who is that employee?

A.     That is Brittany Moore. Brittany was to take – well, was to be like another program manager assistant like I was, because my case load was getting so full she was to be hired to help me.

Q.     Okay.

A.     And Debra stated to her in – the day she had went in to sign her paperwork to move. I believe she was a buyer and she was moving over to program manager assistant.

       . . .

Q.     Okay. And this conversation where Ms. Perry supposedly said, "Be wary of Leslie Huggins," did you overhear that or is that just something that Brittany Moore said to you?

A.     She told me that she was –

Q.     She, being Brittany?

A.     Brittany, yes.

Q.     Okay.

A.     She told me she was leery of – after we had worked together two weeks, she was leery of – at first of coming over and working with me because of what Debra Perry had told her. And that's when she let me – she told me what she had said. Because she said, "You're nothing like that." So I was shocked.

Q.     And what did Brittany Moore tell you that Debra Perry had said about you?

A.     That she needed – she was warning her about me. That she didn't need to be late or I would – you know, I would complain to the boss and that I would call corporate on her.

       . . .

17

> Q. What evidence do you have – I know you feel this way. But what evidence do you have that your termination, the reason for it, the real reason was because of your opposition to racism?
>
> A. Well, as far as, I guess, evidence, I don't know, other than the fact of there's no confidentiality between Lindsey Litsheim and Debra Perry. If one knows something they both know. And Debra tells everything out on the floor to the other employees. And so that – I mean, to me that is proof of how she retaliates against employees.
>
> Q. Okay.
>
> A. Any employee that goes to Lindsey – employees are afraid to go to Lindsey because they know once they go to Lindsey she's going to tell Debra and then she will retaliate against them.

[56], Ex. 1 at p. 18, 20-21, 50.

Additionally, on July 1, 2021, Huggins emailed Litsheim and accused Perry of sharing information with other employees:

> I had thought the situation last Thursday was water under the bridge[.] I have not tried to interact with Devin nor him me. It was brought to my attention today by an employee on the floor, that Debra is telling employees outside of HR that this whole situation was my fault[,] that today her and Mike Simone are supposed to have a meeting about this incident and also talk about the security guards and a fight that had previously happened. Human Resources is supposed to be a confidential place to go especially during workplace investigations.
>
> I am disappointed and feel this is very unprofessional. HR is supposed to be a place where employees feel comfortable to go when issues arise, but now that seems to not be the case. If she is willing to talk about this with employees what else is she talking about?

[56], Ex. 10 at p. 1-2.

Notably, at his deposition, Plaxico testified that three other employees informed him that Perry had been speaking about him behind his back. Specifically, three employees told him that Perry told them "she was brought in to clean up [Plaxico's] mess." [56], Ex. 8 at p. 14.

Regarding communication between corporate HR and local HR, Litsheim testified as follows:

> Q.     . . . But did you ever contact Will Plaxico . . . to inquire, about some complaints that Ms. Huggins made about racism at Keytronics [sic]?
>
> A.     Not about Leslie specifically. We had got an anonymous complaint about harassment from the Mississippi location, and I remembered checking in with Will and asking him if he had ever seen harassment, since he was the previous HR manager, or the situation. And all that I can recall is that he let me know about a situation where the HR team sent a floral – floral arrangement to a funeral that Leslie didn't agree with should have been sent from the company, but it had nothing to do with racism, no.
>
> Q.     Okay. So if Mr. Plaxico says otherwise, he's just wrong?
>
> A.     Correct. My question was about if he had ever experienced any racism or seen any racism, and his response to me was about a floral arrangement sent to a funeral.
>
> Q.     Did you ever ask him whether he knew if other employees had experienced racism?
>
> A.     Yes. During that investigation, we did ask the HR team members.
>
>     . . .
>
> Q.     Did Ms. Huggins ever complain to you that Ms. Debra Perry was telling what should have been confidential HR information to other employees at the local plant?
>
> A.     She did say that in an e-mail. But at the location, you know, we are going to talk to our managers about certain situations outside of HR when we have to address situations.

. . .

A.    And Leslie didn't let me know any names or anything like that, but she did say that in an e-mail to me. Yes.

Q.    Did you conduct an investigation about that and inquire as to other employees?

A.    Yes.

Q.    And what was the result of that investigation?

A.    What I recall today is that none of it involved harassment. A lot of the issues would be about – because if this was during COVID, so maybe an employee not wearing a mask. Or at one point there was a fight that Debra had to break up in the parking lot. And then another one is there's a lot of issues about attendance, but there was nothing about harassment brought forward.

Q.    I'm not asking you specifically about harassment. I was asking you about the confidentiality of things that employees brought forward to HR and whether there were complaints that their concerns were not being kept confidential by Ms. Perry.

A.    I would say no, nothing, you know, outside of talking to a manager or somebody on the leadership team to address performance issues or policy attendance issues.

Q.    Did you have any sort of policy that employees' concerns that were brought to HR should be kept confidential?

A.    No, our policy does not state that. What it states is that it will be kept confidential to the extent possible while conducting an investigation.

[56], Ex. 9 at p. 8-11.

Litsheim's deposition testimony confirms that corporate HR discusses complaints with local HR when conducting investigations. Though Litsheim denies that Huggins complained about race discrimination, she confirms that she called Plaxico when investigating a separate complaint.

20

Her testimony further demonstrates that employee concerns may be discussed with managers and that employee concerns are only kept confidential "to the extent possible." *Id.* at p. 11.

Viewing the above evidence in the light most favorable to Huggins, a reasonable factfinder could conclude (1) that if Huggins complained about race discrimination to Litsheim, Litsheim communicated it to Perry; and (2) that Perry shared HR matters with employees outside of HR. Thus, the remaining question is whether Huggins has presented any evidence to suggest that Caress had knowledge of her complaint.

As noted above, generalized discussions between a decisionmaker and an individual aware of the plaintiff's complaint are not enough to prove that the decisionmaker had knowledge of the complaint. *See EmCare*, 857 F.3d at 683. However, the evidence in this case shows that Caress and Perry had discussions about Huggins around the time that she complained in June 2021 and in the months leading up to her termination. At her deposition, Perry described a June 2021 incident where Caress and Huggins came into her office arguing. She did not remember the exact date but appeared to be describing the June 24, 2021 incident. She then testified as follows:

> Q. Okay. Was any form completed with regard to that incident?
>
> A. Not at that time, no.
>
> Q. Okay. But some time later it was?
>
> A. Correct.
>
> Q. Tell me about that.
>
> A. After they left my office I – I went and to [sic] Devin's office and I asked him what was going on, and he said, I'll send you the documentation, which he sent me that e-mail. But he read it to me, told me about the meeting. And he told me that the invoices weren't getting paid because it wasn't getting billed to the customer, and that it was holding up money. And that he had – had initiated meetings about it before and nothing was getting – nothing was getting any better. . .

> Then I went back into my office, and Devin asked me – he came in and asked me did I read the e-mail, and I told him yes. He said, I want her documented. So that's when I typed up the documentation, and I emailed it to him and I copied Mike Simone.

> Q.  What was the next step? Did he have to sign off on what you had documented? Did he have to approve it? What happened next?

> A.  He printed it. And then on the following Monday, I believe it was – I want to say that happened on a Thursday, and maybe she was off Friday or took off Friday.

> The following Monday he asked me to come to his office, and he brought her in and another argument kind of entailed. And I tried to step in, and she – she just gave me a hateful look and walked out. . .

> . . .

> Q.  Were you, Ms. Perry, a part of these discussions along the way between June and September, or had you sort of been left out of the loop between June and September?

> A.  The only thing that I would get from Devin is, you know, he'd come in and touch base occasionally and said that they were still having trouble with the Elster invoicing not getting done.

[56], Ex. 2 at p. 7-9.

Thus, Perry's testimony demonstrates that she and Caress had discussions about Huggins twice on June 24, 2021, the following Monday, and occasionally until Huggins' termination in September.

Further, the evidence demonstrates that Caress barely spoke to Huggins after the end of June 2021, around the time that she complained of racism. *See* [56], Ex. 3 at p. 17 (Caress' deposition testimony confirming he "made it a point not to . . . continue to interface with her on the subject"). In his September 21, 2021 email to Perry explaining why he was terminating

22

Huggins, Caress described the June meetings and Huggins' alleged refusal to complete the Elster shipping tickets. He then stated:

> I have not discussed the subject in any manner with Leslie since the documented meetings. Her demeanor towards me is very tense and our conversations have been limited to topics of work and her need to be out of the office. I have not felt like any additional conversations would result in any change to her performance and instead I have been keeping copies of the actions that she is not performing.

*Id*. at p. 44.

At her deposition, Huggins confirmed that she did not hear from Caress after the June 2021 meetings. She testified that she was surprised when she was terminated because "[they] had not had no issues [sic], nothing else since June 24th. So I don't even know that I had even talked to Devin since June 24th other than, hey, how are you, you know." [56], Ex. 1 at p. 12.

In summary, Huggins has pointed to evidence from which a reasonable factfinder could infer that Litshiem told Perry about her complaint about race discrimination. She has further pointed to evidence that Perry and Caress had specific discussions about her and that Caress stopped speaking to her shortly after she complained about race discrimination. Taking this evidence into account along with the evidence of pretext discussed below, the Court finds that there is a question of fact as to whether Caress had knowledge of Huggins' complaint.

This brings the Court to Huggins' evidence of pretext.

    *ii.*    *Timing*

First, Huggins contends that prior to June 2021, she had never been written up, reprimanded, or had any other complaints about her job performance. She contends that the first reprimand in her file was the one prepared on June 24, 2021, the *same day* she complained to Litsheim about racism in the workplace, suggesting it was retaliatory.

In response, Keytronic disputes that Huggins complained to Litsheim on June 24, 2021. Keytronic asserts that Huggins received the reprimand on June 24, 2021 and then complained to Litsheim *after* June 24, 2021 but before June 28, 2021. Keytronic argues that the reprimand occurred prior to Huggins' protected activity and therefore "cannot serve as part of a retaliation claim because there was nothing to retaliate against." [67] at p. 7-8 (quoting *Watkins v. Tex. Dept. of Crim. Justice*, 269 F. App'x 457, 462 (5th Cir. 2008)).

The Court therefore begins with the evidence regarding the date of Huggins' alleged complaint to Litsheim. At her deposition, Huggins testified as follows:

> Q. . . . You said, "I both e-mailed and spoke to the corporate human resources director during June and July 2021 concerning the race discrimination and retaliation that was occurring."
>
> A. Correct.
>
> Q. All right. When you say you e-mailed and spoke to the corporate human resources director, would that be Lindsey Litsheim?
>
> A. Correct.
>
> Q. Anybody else you spoke to about that?
>
> A. No, sir.
>
> Q. Okay. And the e-mail – again, I've never seen that. Do you have a copy of it?
>
> A. I do not.
>
> Q. Okay.
>
> A. But I know the date range when it was.
>
> Q. And the date range would have been?
>
> A. Between the 24th and the 28th. I actually believe I sent it on the 28th, on that Monday.

Q.      28th of June, 2021?

A.      Correct.

Q.      Okay.

A.      To Lindsey.

Q.      And do you believe you sent it – do you know what time of day?

A.      It would have been that morning.

Q.      Okay.

A.      Because she – in the email I had let her know that Debra did no mediation, Debra didn't open her mouth, she didn't try to calm down the situation or anything. And so sometime that evening Debra – I can't remember if she e-mailed me or if she called me to come to her office and said she wanted to know my side of the story. And so I said, "Now you want to know my side of the story, because you didn't open your mouth about it Thursday." And so I knew that – that morning, I believe, was the morning I had sent Lindsey the e-mail.

Q.      Is that the same day you had called Lindsey as well?

A.      No, sir.

Q.      Had you called Lindsey before that?

A.      I had called Lindsey before that. Yes, sir.

Q.      All right. So you called Lindsey before June 28th, but after June 24th and expressed to Lindsey what? Tell me what you said.

A.      That – I had kind of told her some situations that was going on in the plant and that I had felt Debra was racist. And Lindsey's response was, no, she didn't think she was.

        . . .

25

> Q. Anything else that you told Lindsey Litsheim in this telephone call that occurred between June 24th and June 28th other than that Debra was snippy, in your opinion, with black employees, the situation about Brianna Cox and Kim, and that you felt that Debra was racist? Anything else you told Lindsey?
>
> A. Yes.

[56], Ex. 1 at p. 16-17.

Huggins first indicated that she *emailed* Litsheim between June 24 and June 28, 2021. She then specified that she emailed Litsheim on June 28, 2021 about Perry's failure to mediate or "calm down" the heated meeting between her Caress on June 24, 2021.[8] Then, in two leading questions, counsel stated that Huggins *called* Litsheim "before June 28th, but after June 24th." *Id.* Huggins answered his questions without correcting him on the date of her call. Viewing the evidence in the light most favorable to Huggins, she never specifically testified as to the date that she called Litsheim to complain about race discrimination. She only testified that the phone call occurred before the email she sent on June 28, 2021.[9] The date of her call is an issue of fact to be resolved at trial. Therefore, whether Huggins complained to Litsheim before she received the reprimand is also an issue of fact to be resolved at trial.

Additionally, Keytronic argues that Huggins' termination was similarly unrelated to her protected activity because her call to Litsheim occurred *after* she was already on "thin ice" for her performance issues. [67] at p. 8. Keytronic offers the following timeline: Caress disciplined and reprimanded Huggins for failure to perform her job functions on June 22 and June 24, 2021;

---

[8] The quoted excerpt does not specify that Huggins was referring to the June 24, 2021 meeting when she complained about Perry in her email. However, earlier in the deposition, Huggins specifically discussed Perry's failure to intervene in that meeting. *See* [56], Ex. 1 at p. 10-11.

[9] The Court notes that at his deposition, Plaxico testified that Huggins complained to him that Perry favored White applicants during the hiring process. *See* [56], Ex. 8 at p. 26. In his declaration, Plaxico clarified that Huggins complained to him before he began medical leave at the end of June 2021.

Huggins complained to Litsheim after June 24, 2021 but before June 28, 2021; and Huggins was thereafter terminated for her continued failure to perform her job functions. According to Keytronic, where the employee misconduct providing grounds for termination pre-dates the protected activity, there is no causal connection between the protected activity and termination.

In support of its position, Keytronic cites the following caselaw from the Second Circuit: "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance A. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). The Supreme Court has likewise held that where a gradual adverse employment action begins prior to an employee's protected activity, "[the employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).

There are two problems with Keytronic's position. First, as discussed above, the date of Huggins' protected activity remains a question of fact. As such, there is question of fact as to whether any gradual adverse job action began prior to her complaint.

Second, Keytronic contends that after it disciplined and reprimanded Huggins, she was thereafter terminated for her *continued* failure to perform her job functions. In other words, it contends that Huggins' termination was a continuation of discipline that began prior to her complaint. As the Court will discuss below, there is a question of fact as to whether Huggins failed to perform her job functions after she was disciplined on June 24, 2021 and allegedly received the reprimand.[10] Therefore, there remains a question of fact as to whether Keytronic simply proceeded along lines contemplated prior to Huggins' complaint because she in fact failed to improve.

---

[10] The Court notes again that at her deposition, Huggins testified that Caress repeatedly told Perry to write her up, but she denied having ever received the reprimand. *See* [56], Ex. 1 at p. 10-11.

The Court finds that there is other evidence with respect to timing that is suggestive of pretext. Namely, as noted above, Caress made it a point to barely speak to Huggins after the end of June 2021, around the time that she complained of race discrimination. *See* [56], Ex. 3 at p. 17. A reasonable factfinder could conclude that Caress stopped communicating with and therefore wished to terminate Huggins due to her complaint. *See Robinson*, 714 F. App'x at 360 (changed decisionmaker behavior following complaint may be an indicator of causation).

This brings the Court to the evidence regarding Huggins' performance.

### iii. Performance

Keytronic contends that Huggins was terminated for insubordination and failure to perform a duty—in particular, her alleged refusal to complete the Elster shipping tickets. At his deposition, Caress alleged that Huggins refused to complete them because she did not believe that the shipping tickets were her responsibility. *See* [56], Ex. 3 at p. 8-10.

On the other hand, at her deposition, when confronted with the June 24, 2021 email to McCormick that made it appear as if she denied that the tickets were her responsibility, Huggins asserted that she knew she had the primary responsibility for the tickets. She testified as follows:

> Q.    And then you responded at 3:51 p.m. and told her, "I'll be out of the office tomorrow, but this is part of the program manager duties, or at least it always has been in the past. I just took this on to help Ricky out some before you were hired on. Thanks."
>
> A.    Correct.
>
> Q.    So Keisha was saying that it was her understanding that she only did these Elster Laredo shipping tickets when you were not there, and you are saying, well, I'm not going to be here tomorrow, but it has always been the responsibility of your position and not mine, or least it has been in the past. That's what you were saying?

28

> A.    I was letting her know that in the past it was the program manger's duty, that I had took it on to help.
>
> Q.    And then Keisha responds, "Thank you for letting me know we [sic] are out tomorrow. We can review with Devin to clear up any confusion."
>
> A.    Correct.
>
> Q.    All right. Did Devin take the position that he wanted you to have the primary responsibility for these shipping tickets to the Laredo facility at Elster?
>
> A.    I never didn't have the primary. I mean, that's what I'm saying, like it was kind of a whole confusion. I was just letting her know that in the past that has been the program manager. She was new, so I was just letting her know she was to take this on over, that in the past – I was just here to help. And I never refused. I never said I'm not going to continue to do them.
>
> Q.    Okay.
>
> A.    I was still doing them.

[56], Ex. 1 at p. 9-10.

Additionally, at her deposition, Huggins seemed to admit that there were communication issues with the shipping department, but she asserted that she sent the shipping tickets when shipments were ready and that she never refused to do so:

> Q.    Had there been any issues in terms of the providing of timely paperwork for shipments to Elster Laredo between June 24th and September 27th?
>
> A.    Not that I was aware of, other than just the regular – you know, if shipping – if there was an issue with shipping, the Laredo shipments were different than just the regular. So shipping had to notify me when they were prepared and ready, so then I could do – it was basically like a – kind of like an all-day process. So if I didn't know from shipping that they were ready, shipping tickets couldn't get sent out. So that's why – and prior I had went to Devin about it because there were some issues going on with shipping that

> I was not being made aware of. And then I could have been off that day. I don't know. There was a couple of things. But I always sent them out if I was made aware and never refused.
>
> . . .
>
> Q.     But you could go on the system and determine that, in your example, 500 were ready to be shipped out and that shipping had everything they needed. Now, whether or not they were going to send them out or not as per what was on the computer, you don't know. But you could go on and determine that it was ready?
>
> A.     I could look to see if they were done.
>
> Q.     Right. Okay. And did you do that on a regular basis or daily basis?
>
> A.     Sometimes I would. Sometimes shipping would notify me. It just depends. But I couldn't ship out no shipping ticket to Elster without knowing that shipping was complete and done on their end.

[56], Ex. 1 at p. 12.

In his September 21, 2021 email to Perry, Caress alleged that he continued to document the issues with Huggins after he stopped speaking to her. *See* [56], Ex. 3 at p. 44 ("I have been keeping copies of the actions that she is not performing."). On the other hand, at his deposition, Caress testified as follows:

> Q.     All right. When I – when I look at them, just taking them as a whole, but the exhibits that have been introduced, none of them concern any alleged misbehavior by Ms. Huggins between the last time you talked to her on June 28th and the date that she was terminated on –
>
> A.     The 27th of September.
>
> Q.     – 27th of September. There's no document – no documentation in there that she'd been guilty of any misbehavior during that time. Am I correct?

30

> A.  No additional documentation, no.

*Id*. at p. 17.

Next, at this deposition, Caress contended that following the June 2021 meetings, summer intern Sophie Cornelius or program manager Ricky Perry stepped in to assist when Huggins failed to complete the Elster shipping tickets:

> Q.  Following these events in June, late June of 2021, did issues with the proper preparation of the documentation continue or –
>
> A.  They did. Yeah, they did. Leslie refused. I then assigned – assigned Ricky Perry, the program manager. He was also a direct report to me. I asked Ricky if he would outline every time a document like that was missed. I then added – I added a layer of check that before the product would go out, before it was allowed to actually ship out of the building, before there would be a quality inspection, that that document was attached.
>
> When it wasn't, then I had either Sophie Cornelius – if it wasn't, which meant Leslie refused, then I had Sophie Cornelius or Ricky Perry provide the document so that we would ensure that we were meeting the requirements for our customer so that we would discontinue – discontinue that from not occurring.
>
> I would like to – I would like to state though the urgency and the severity of this activity not occurring properly caused Keytronic to get what they refer to as a CAPA, corrective action preventative action form from the customer that essentially says you're not doing your job. You're not meeting the requirements of this, and we need you to put a corrective action, a preventative action in place.
>
> That CAPA, the result of that CAPA was what I just described. I actually would have quality inspect to make sure that it was being done. If it wasn't, then we had a process that said I can get somebody to do it so that it could go out the door.

*Id*. at p. 12-13.

To summarize, Caress testified that after receiving a CAPA, he added a "layer of check." *Id.* at p. 12. That is, the quality department inspected shipments to ensure a shipping ticket was attached. If a shipping ticket was not attached, Cornelius or Ricky provided the document. Caress alleged that Ricky documented every time a document was missed.

Ricky and Perry's deposition testimony differs from Caress' testimony on these points. Regarding whether he was discussing the shipping ticket issue with anyone, Ricky testified:

> Q.     Okay. During the time when Ms. Huggins was responsible for [the shipping tickets], was she sending the company the documentation that it needed?
>
> A.     Yes. Maybe just not in a timely manner.
>
> Q.     Okay. Did you have any discussions with her about those issues of timeliness?
>
> A.     No. She did not work for me, like I said.
>
> Q.     Did you have any discussions with anybody at Keytronics [sic]? Did you say, Hey, Leslie is not getting this done on time?
>
> A.     No.
>
> Q.     Okay. Did anyone come to you and ask if there were any problems?
>
> A.     Not to my knowledge, no.

[56], Ex. 4 at p. 4.

In other words, Ricky denies that he was speaking to Caress about the shipping ticket issue.

Further, regarding the CAPA process, Ricky testified:

> Q.     Okay. If you received those [corrective action] plans, would it have been, like, an actual document that would have been maybe electronically communicated to the company, or how did those come to you?
>
> A.     Yes. If it was a corrective action they would e-mail.

Q.      Okay. So there would be a copy of it if it happened?

A.      Yes.

*Id.* at p. 5.

At her deposition, contrary to Caress' assertion, Perry testified that she found no CAPA:

Q.      Did you have any awareness of whether Keytronic had ever received a corrective action plan relating to those Elster invoices?

A.      To my knowledge there's not one, and I have asked everyone. That was asked of my last week.

Q.      Fair enough.

A.      And I cannot find any evidence of it.

        . . .

A.      And quite often a – let me explain that. Quite often a customer may say they're going to file a corrective action and not necessarily do so. They use that as a way to move things along.

Q.      Like a threat maybe?

A.      Yeah. But to my knowledge one has not been filed[.]

Q.      If you had gotten a CAPA, would it be a written document that was sent to Keytronics [sic] electronically? Have you ever seen a CAPA before?

A.      Yes.

Q.      Okay.

A.      It's an electronic document. It's very extensive. It requires – within 24 or 48 hours it requires a response. And it's initiated by our quality department.

Q.      Okay. But in that case, in this case with Elster, you do not believe there is one?

33

A.     I don't believe so, no.

[56], Ex. 2 at p. 13-14.

There is a question of fact as to whether Huggins refused or failed to complete the shipping tickets after the June 2021 meetings. According to Huggins, she knew the shipping tickets were her responsibility and she did not refuse to complete them. Caress testified that after the June 2021 meetings, he did not bring up the issue with Huggins again and did not document the issue further. While he asserted that Ricky documented the issue and that the company received a CAPA (a very extensive document for which there would be a record), there is evidence that contradicts those assertions.

Crucially, as noted above, Caress stopped speaking to Huggins around the time that she complained of race discrimination. While Caress asserted that he did not bring up the issue again because of Huggins' tense attitude, a reasonable juror could doubt that explanation. If, as Caress asserts, Huggins yelled at him more than once, repeatedly asserted that the shipping tickets were not her responsibility, and refused to sign the written reprimand, a reasonable factfinder could question why he did not terminate her earlier, continue correcting her, or thoroughly document the issue over the next three months.

Further, as discussed above, Caress had multiple conversations about Huggins with Perry, and there is a question of fact as to whether Perry and Caress were aware of and discussed Huggins' complaint regarding race discrimination.

For these reasons, construing the evidence in the light most favorable to Huggins, a reasonable juror could find that Keytronic's proffered reason for Huggins' termination—insubordination and failure to complete the Elster shipping tickets—is unworthy of credence and that retaliation was the real reason for her termination.

*Conclusion*

For the reasons set forth above, Keytronic's Motion for Summary Judgment [56] is DENIED. Huggins may proceed to trial on her retaliation claim brought under Title VII and Section 1981.

SO ORDERED, this the 28th day of March, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE